## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| MERIMA OSMANOVIC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:20-CV-627-SNLJ |
| | ) |
| KILOLO KIJAKAZI, [1] | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

The Commissioner of the Social Security Administration denied plaintiff Merima Osmanovic's application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff now seeks judicial review. *See* 42 U.S.C. § 405(g). As discussed below, the Commissioner's decision is not supported by substantial evidence on the record as a whole and will be remanded.

### I. Background

### a) Plaintiff's medical history.

Plaintiff was born in 1968. She moved to the United States from Bosnia. Her work history included moving boxes, hand packaging cookies, and cleaning houses. She stopped working in 2016. She protectively filed applications for disability insurance benefits and

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

supplemental security income in October 2017, alleging an onset date of January 1, 2017. She alleged the following impairments: chronic back pain, pinched nerve, hypothyroidism, chronic kidney infection, arthritis, and difficulty walking. Plaintiff claims she cannot work due to pain in her back, neck, hand, hips, and legs.

Plaintiff's medical records start in 2016 with an emergency room visit where she complained of back and abdominal pain and reported a history of low back pain. Plaintiff returned to the ER in April 2017 with back pain and urinary issues. She was diagnosed with musculoskeletal back pain. She presented with a flat affect and depressed mood; the doctor noted she appeared depressed and withdrawn and that this may have contributed to her symptoms. Plaintiff made a third visit to the ER in August 2017 with flank pain, which her treatment provider opined may have been due to acute muscle strain.

Plaintiff received care at Family Health Care Centers from 2017 to 2019. In October 2017, she had a new patient visit with Dr. Li, where she reported chronic back pain and thyroid issues. Her examination was normal and done via an interpreter. Plaintiff saw Dr. Li again in November 2017, complaining of daily headaches that had been ongoing since 2011 and worsening over the past few years. She also reported an intermittent shooting pain down her leg, which she said a back specialist had attributed to a hip problem. Plaintiff exhibited a slightly depressed mood and was prescribed several medications, including cyclobenzaprine for chronic headaches, with neck pain listed as a major trigger.

Plaintiff had a follow-up appointment with Dr. Li in March 2018. Plaintiff reported headaches that Tylenol did not help. Plaintiff said she had difficulty brushing her hair due

to pain and had neck pain and nausea.  She showed normal motor strength, balance, gait, stance, and affect.  She continued cyclobenzaprine and Tylenol for pain.

Plaintiff returned for follow-up with a different doctor in June 2018.  Plaintiff reported ongoing back and shoulder pain that caused daily tension headaches.  Plaintiff said she had received regular shots in her back from a pain management doctor but had been unable to continue due to a change in insurance.  Plaintiff reported the cyclobenzaprine did not relieve her pain.  She reported feelings of depression.  She exhibited tenderness in her back and in range-of-motion exercises, and her back muscles were very tight.  The doctor recommended continuing cyclobenzaprine with increased dosage plus ibuprofen.  Plaintiff also started on an anti-depressant.

In July 2018, plaintiff returned to her family health clinic and saw a social worker for a behavioral health consultation.  The provider noted plaintiff spoke Bosnian and came in with her daughter.  Plaintiff reported depression, anxiety, chronic body pain, and trouble sleeping.  She reported difficulty going in public because of anxiety.  Plaintiff saw the same social worker again a couple weeks later.  Her records from that visit noted she spoke without an interpreter as she was "confident speaking English."  Doc. #12-10 at 405. Plaintiff reported no improvement.  She stated her primary coping strategy was to imagine she was talking to family members who were not there.  Plaintiff reported she could not sleep because she was worried about her children's safety.

In July 2018, plaintiff went to the ER with abdominal pain.  An ultrasound revealed a contracted gallbladder.  She was discharged with oral analgesics.

In August 2018, plaintiff had a follow-up appointment with Dr. Li at the Family Health Care Center.  She reported ongoing, acute pain from her gallbladder issues.  She was still taking various medications, including cyclobenzaprine, ibuprofen, and an anti-depressant.  Her examination appeared normal except for abdominal tenderness.

In September 2018, plaintiff returned for another follow-up appointment with Dr. Li.  She reported mood issues, trouble sleeping, continuing abdominal pain, and chronic headaches that were not alleviated by ibuprofen.  Her examination again appeared normal except for abdominal pain.  Her treatment plan included an MRI for headache syndrome.

In November 2018, plaintiff had a gallbladder evaluation at Washington University Acute and Critical Care Surgery Clinic.  The notes indicate plaintiff had an interpreter present.  The doctor opined plaintiff's severe abdominal pain may have resulted from peptic ulcer disease or gastroesophageal reflux disorder.  That month, plaintiff also went to Mercy Hospital South complaining of a headache and nausea.  Plaintiff reported a history of headaches that "usually resolve with excedrin and do not cause her to vomit.  She did try excedrin x2 today without improvement."  Doc. #12-11 at 474.  Plaintiff did not report back or neck pain.  Plaintiff presented as alert and oriented, with normal mood and affect.  Plaintiff received pain treatment, and after a normal CT head scan, the doctor noted she may have tension headaches and prescribed a codeine medication for migraines.

In May 2019, plaintiff reported to Mercy Hospital South complaining of hand pain and had x-rays, which did not show any abnormalities.  That same month, plaintiff returned to her family health clinic twice.  On May 13, she saw Dr. Li with complaints of headaches and hand pain.  Her MRI results were normal.  Plaintiff complained of nearly daily

4

headaches that were not alleviated by Tylenol or Excedrin.  Plaintiff also complained of joint pain in her hands.  Plaintiff returned on May 20 to receive a trigger point injection to treat her recurrent headaches.

In June 2019, plaintiff returned to Mercy Hospital South for urinary issues.  In July and August 2019, she went to her family health clinic twice more and saw Dr. Rada.  In July, plaintiff reported chronic joint pain, particularly in her hips, and stated Naproxen and anti-depressants were not helping her.  Dr. Rada noted plaintiff spoke Bosnian and referred her for a variety of follow-up appointments, including with the Rheumatology Department.  In August, plaintiff complained of worsening back pain with walking, sitting, and activity.  She claimed the pain awakened her from sleep.  She reported pain radiating through her hips and legs, numbness, and tingling.  Plaintiff reported taking Meloxicam, Tylenol Extra Strength, and Alleve but said they did not help her pain.  She said she had previously received gabapentin and oxycodone during her time with the pain clinic, which helped with her activity level but did not completely relieve her pain.  She also reported daily neck pain and tension headaches that had improved with morphine during an ER visit, as well as ongoing depression that was not managed by her anti-depressants.

Dr. Rada noted tenderness in plaintiff's back, with intact sensation, strength, and range of motion.  Plaintiff reported fatigue, poor appetite, decreased concentration, restlessness, depression, hopelessness, sleep disturbances, low self-esteem, and extreme difficulty in activities of daily living due to depression symptoms.  Dr. Rada adjusted plaintiff's treatment for pain and depression, including new and increased pain medications

and anti-depressants, Lidocaine patches, more trigger point injections, and a recommendation that she participate in a chronic pain study.

**b) Plaintiff's consultative examinations.**

Plaintiff also participated in several consultative examinations.  In February 2018, Dr. Mark Lysne, a psychologist, conducted a mental status and daily functioning consultative examination of plaintiff via an interpreter.  Dr. Lysne noted plaintiff walked with a slow and hesitant gait, sat with a pained-looking posture, changed position often in apparent attempts to manage pain, and had difficulty rising from a seated position.  Plaintiff reported chronic pain in her back, fingers, feet, and legs at a level of 8/10, which she felt was typical.  She said she was not taking her prescribed thyroid or pain medications or antidepressants because she did not have health insurance.  Plaintiff described ongoing issues with depression and anxiety and said she had participated in psychotherapy for three years, but felt it did not help.  Plaintiff felt her depressive symptoms had worsened since she stopped working.  Plaintiff experienced war conditions in Bosnia and witnessed severe injuries to friends and relatives, including her son.  She reported persistent nightmares, fear, anxiety, and panic symptoms.  Dr. Lysne noted she seemed to meet the criteria for posttraumatic stress disorder (PTSD).

Plaintiff said her daily activities included caring for her dentures, washing her face, making and drinking coffee, smoking, napping, and sitting in the living room watching television.  She reported she did not do many household chores because of pain, but sometimes did dishes when she felt better.  She avoided running errands due to anxiety when out in public.  She denied any problems maintaining her personal hygiene.  She said

she had stopped most activities over the past few years but would occasionally go for a walk when the weather was warm.

Dr. Lysne noted plaintiff was focused on her pain and the stress it caused her.  He noted she "seemed to be at least moderately exaggerating her inability to understand and complete even simple screenings" but nonetheless appeared to have some mild difficulty with concentration and short-term memory.  Doc. #12-10 at 380.  He noted her deficits in abstract thinking and cognitive functioning appeared to be exaggerated.  He also found criteria for a somatic symptom disorder, as plaintiff "seemed quite anxious and preoccupied with limitations caused by pain" and her reports of pain seemed to be "quite high."  *Id*.  Dr. Lysne's diagnostic impressions were major depressive disorder, PTSD, and somatic symptom disorder.  Dr. Lysne concluded plaintiff's "anxiety and depression symptoms may lead to occasional difficulty in completing complex or even routine activities with persistence and pace" and that "[i]n her present state, it seems likely that she would be able to tolerate stress in entry-level work but not consistently."  *Id*. at 381.

In March 2018, plaintiff had an orthopedic evaluation, at which she was accompanied by an interpreter.  Plaintiff said she had suffered low back pain since 2012 and had received back injections for two years when she had insurance.  The records stated plaintiff could sit or stand for 10 minutes, walk 15 minutes, and do a one-time lift of only 2-3 pounds.  Plaintiff indicated her daughter had to help her put on her shoes, get out of the tub, wash her lower legs, and do all household chores, cooking, and grocery shopping.

Plaintiff could walk 50 feet but stopped after 25 feet.  The examiner noted plaintiff sat and moved with a painful expression on her face and complained of low back pain with

all movements.  She was able to rise from a chair and get on the examining table on her own, but needed help moving from a supine to sitting position.  She did not use a cane.  The examination of her extremities was unremarkable but accompanied by complaints of low back pain.  She showed full range of motion in her hips and ankles, and she demonstrated 5/5 strength in her lower extremities, but she exhibited back pain with neck, hip, and leg movements.  After x-rays, the doctor's clinical impressions were low back pain with degenerative disc disease and mild degenerative scoliosis.

In August 2019, Dr. Rada—one of plaintiff's treating physicians at the Family Health Care Center—completed a Physical Residual Functional Capacity Questionnaire.  She noted plaintiff's symptoms included numbness and tingling; sharp shooting pains; tension headaches; fatigue; anxiety; insomnia; and pain when sitting, standing, and laying down.  Dr. Rada characterized plaintiff's pain as severe, chronic, constant, and worse with movement and activities.  She identified tenderness in plaintiff's back.  When asked to identify psychological conditions affecting plaintiff's physical condition, Dr. Rada identified depression, anxiety, and psychological factors affecting physical condition.

Dr. Rada found plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in her assessment.  She opined that plaintiff would experience pain severe enough to interfere with attention and concentration needed for simple work tasks frequently or constantly during a workday.  She estimated that in a full-time work situation, plaintiff could not walk a city block without rest or severe pain; could only sit for 30 minutes at a time; could only stand for 10 minutes at a time; and could sit and stand/walk less than 2 hours total in an 8-hour working day.  She thought plaintiff

would need to get up to walk for 1-5 minutes every 20-30 minutes during the workday and stated plaintiff must use a cane or other assistive device while standing/walking.  She estimated plaintiff would need to take unscheduled breaks every hour during a workday and would need to rest for 10-15 minutes before returning to work.  She stated plaintiff can never lift and carry even less than 10 pounds in a competitive work situation.  She estimated plaintiff would miss work because of her impairments more than 4 days per month.

**c) Plaintiff's Disability Determination Explanations.**

In March 2018, state agency consultant Larry Kravitz, Psy.D., reviewed plaintiff's records and provided an administrative medical finding on her mental limitations.  He found plaintiff had moderate limitations in attention and concentration, ability to complete a workday without interruptions from psychologically-based symptoms, and ability to interact appropriately with the general public.  Dr. Kravitz determined her "depression and pain related symptomatology would interfere with sustainability at times" but that she "should be able to persist on simple and detailed tasks mentally."  Doc. #12-4 at 67.

In April 2018, state agency consultant Paul Midden, Ph.D., reviewed plaintiff's records and provided an administrative medical finding regarding her mental limitations.  Dr. Midden concluded plaintiff's depression and PTSD are non-severe.

In April 2018, state agency consultant Kevin Threlkeld, M.D., reviewed plaintiff's records and provided an administrative medical finding regarding her physical limitations.  Dr. Threlkeld concluded plaintiff's report of the severity of her symptoms was only partially consistent with the medical evidence.  He determined plaintiff had certain exertional, postural, and environmental limitations but retained the capacity for light work.

**d) Plaintiff's disability hearing.**

The ALJ held a hearing on August 26, 2019, at which plaintiff and a vocational expert testified.  Plaintiff testified she can speak a little bit of English, but she testified with the assistance of an interpreter.  Plaintiff detailed her prior work history but said she could no longer work due to pain in her back, neck, hips, legs, and hand.  Plaintiff testified the pain in her back and neck was consistently a 9/10; sometimes 8/10 in her left hand, but less with medication; and 10/10 in her left hip and leg and 7/10 in her right hip and leg.  She said sitting or standing for a long time or walking worsened her pain.  Plaintiff testified that prescription medications and neck injections had helped reduce her symptoms, though she did not say to what extent.  She said she was recently diagnosed with lupus and had been prescribed a cane, which she had been using for a couple months.  Plaintiff reported trouble with her memory, concentration, and sleep and said she does not go anywhere because she is nervous around crowds of people.

Regarding daily activities, plaintiff testified she cannot prepare her own meals; care for her 5-year-old grandson; dress herself in anything with buttons; wash her own hair, back, or legs; put her hair in a ponytail; pull up her own pants after using the toilet; clean; unload the dishwasher; do laundry; lift a gallon of milk; walk a city block; garden or do yard work; take out the trash; or go to the grocery store.  Plaintiff testified her daughter, who she lives with, must do these things for her.  Plaintiff does not go out for social engagements.  She spends most of the day laying down or sitting a little bit to watch TV.

A vocational expert also testified at the hearing.  The ALJ posed a hypothetical involving an individual with plaintiff's age, education, and past work history who could

10

perform work at the light exertional level with the ability to occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally stoop and crawl; and interact frequently with supervisors and coworkers and occasionally with the public.  The ALJ's hypothetical individual could not work at unprotected heights or around moving mechanical parts and was limited to simple, routine tasks.  The vocational expert testified that this hypothetical individual could perform plaintiff's past jobs as a day worker and hand packager, at the light level at which plaintiff performed them.  The ALJ asked an additional hypothetical in which this individual would be off-task 15 percent in addition to normal breaks.  The vocational expert testified that person could not perform plaintiff's past work or other work in the national economy.  The expert also testified that if that person could not work a full eight-hour day; needed redirection once or more per day because of persistence and pace difficulties; or needed additional rest breaks beyond those ordinarily provided in these work environments, that person could not perform the jobs she identified.

## II.   The ALJ's Disability Determination.

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

11

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability.  20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1).  At step one, the Commissioner considers whether the claimant is engaging in substantial gainful work activity.  Here, the ALJ found plaintiff did not perform substantial gainful activity during the alleged period of disability.

At step two, the Commissioner considers whether claimant has a severe impairment that significantly limits her ability to work.  The ALJ found plaintiff had several severe impairments that significantly limit her ability to perform basic work activities: degenerative disc disease, headache syndrome, somatic symptom disorder, depressive disorder, and PTSD.

At step three, the Commissioner determines whether any severe impairments meet or medically equal the criteria of an impairment listed in the applicable regulations.  The ALJ found plaintiff's severe impairments did not meet or equal the severity of a listed impairment.  The ALJ found plaintiff's mental impairments caused mild or moderate limitations, noting plaintiff exhibited good memory recall, normal affect and speech, and non-impaired thought content and that she got along with others, presented as alert and oriented, and reported no difficulty managing her finances or grocery shopping.

At step four, the Commissioner assesses whether the claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i), 416.920(a)(4)(iv), 416.945(a)(5)(i).  An RFC is "defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental

limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotations omitted); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  If, upon the findings of the ALJ, the claimant retains the RFC to perform past relevant work, she is not disabled, and the analysis ends.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

At step four, the ALJ found plaintiff had the RFC she described in her hypothetical to the vocational expert: the ability to perform light work, including occasionally climb ramps, stairs, ladders, ropes, and scaffolds and stoop and crawl; an inability to work at unprotected heights or around moving mechanical parts; a limitation to simple, routine tasks; and the ability to frequently interact with coworkers and supervisors and occasionally interact with the public.

In the step four analysis, the ALJ concluded plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms but that her statements about the intensity, persistence, and limiting effects of her symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  Doc. #12-3 at 16.

The ALJ explained this finding as follows.  First, the ALJ noted that throughout plaintiff's 2017 records, her physical examinations were normal; she displayed 5/5 strength; and her labs were unremarkable.  The ALJ concluded these findings supported plaintiff's ability to work at the light exertional level and occasionally stoop and crawl.

Second, the ALJ found the record did not align with plaintiff's claim that she could not do anything at home or needed extensive aid grooming herself, noting that at her 2018 orthopedic evaluation, plaintiff could rise from a chair and get on an examination table; the

13

examination of her extremities was unremarkable; the range of motion in her hips and ankles was overall good; and she displayed 5/5 strength in her lower extremities.  The ALJ concluded these findings showed plaintiff's ability to occasionally climb ramps, stairs, ladders, ropes, and scaffolds.

Third, the ALJ found that in 2018 records, plaintiff had normal physical examinations, including normal strength, balance, gait and stance, sensation, and motor strength.  The ALJ found plaintiff was only advised to take ibuprofen for her back pain in June 2018 and displayed full range of motion and no swelling or tenderness with her reported pain at a July 2018 hospital visit.  The ALJ also concluded that despite plaintiff's testimony, the record did not establish that she needed to use a cane, citing plaintiff's March 2018 orthopedic evaluation where the examiner said plaintiff did not use a cane.  The ALJ did not comment on Dr. Rada's statement that plaintiff needed a cane in August 2019 or on plaintiff's testimony at the August 2019 hearing that she had only started relying on a cane a couple months prior.

Fourth, the ALJ found that in late 2018 and 2019, despite some back tenderness, plaintiff had a normal physical examination in August 2019, with intact range of motion, strength, and sensation.  The ALJ noted plaintiff complained of headaches at a November 2018 examination but did not report back or neck pain and had normal head imaging.  The ALJ noted plaintiff received migraine medication and an injection for her headaches, but concluded her headaches were not severe enough to prevent her from working.

Regarding plaintiff's mental impairments, the ALJ noted plaintiff's depressive disorder, somatic symptom disorder, and PTSD and stated that "[e]ach of the claimant's

14

mental impairments has been fully accounted for in the residual functional capacity." Doc. #12-3 at 17.  The ALJ noted: "In 2018, the consultative examiner assessed the claimant as having somatic symptom disorder (6F/5).  This was because the examiner found that the claimant appeared to exaggerate her inability to understand instructions, as well as her difficulty in responding to questions (6F/5)."  *Id*.  Besides this apparent finding that plaintiff's somatoform disorder diagnosis resulted from her possible exaggeration of her cognitive abilities, the ALJ did not discuss plaintiff's somatoform disorder.  The ALJ noted the inconsistencies between plaintiff's cognitive performance in her mental examination— such as her inability to remember the examiner's name after 50 minutes or to understand instructions to count by serial 7's—and her medical records, in which she was alert and oriented and demonstrated normal behavior, speech, mood, affect, and recall.

The ALJ noted one record in which a social worker noted that plaintiff could speak English without an interpreter and found that was inconsistent with plaintiff's "displayed language barrier during her consultative examinations."  Doc. #12-3 at 17.

The ALJ also considered the consultative and administrative medical opinions provided by Dr. Rada, Dr. Lysne, Dr. Midden, Dr. Kravitz, and Dr. Threlkeld.

Dr. Rada was plaintiff's treating physician.  The ALJ concluded her opinions about plaintiff's ability to stand, walk, sit, and lift were not persuasive because they were not consistent with the overall record, which was full of normal physical examinations, including a "normal physical examination" by Dr. Rada in July 2019.

The ALJ also found the consultative mental examination by Dr. Lysne unpersuasive because it was inconsistent with the overall record, including plaintiff's "normal" mental

status examinations.  The ALJ found Dr. Lysne's opinions inconsistent with Dr. Lysne's own findings because he stated plaintiff appeared to exaggerate impairments in her cognitive functions, like ability to understand instructions.

Regarding the administrative assessments, the ALJ found Dr. Midden's assessment that plaintiff's mental impairments are non-severe as partially persuasive, though the ALJ found it not fully consistent with the overall record and stated she had considered plaintiff's subjective reports to Dr. Lysne in assessing her RFC.  The ALJ found Dr. Kravitz's assessment that plaintiff could do simple and detailed tasks persuasive, though limited plaintiff to simple, routine tasks to account for her impairments.  Finally, the ALJ found Dr. Threlkeld's finding that plaintiff had the RFC to do light exertional work persuasive because it was supported by the doctor's review of the record and "consistent with the overall record, including the claimant's normal physical examinations." *Id*. at 18.

Based on these findings, the ALJ found plaintiff could perform her past relevant work as a day worker and hand packager at the light level at which she performed them. Consequently, the ALJ found plaintiff was not disabled and did not proceed to Step Five. Plaintiff sought review, which was denied.  Defendant agrees that plaintiff has exhausted her administrative remedies and that the ALJ's decision is the final decision of the Commissioner subject to judicial review.

### III.    Standard of Review

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. §§ 405(g); 1383(c)(3).  Substantial evidence is less than a preponderance of the evidence but enough that a reasonable person would

16

find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (cleaned up). The Court must also consider any evidence that fairly detracts from the Commissioner's decision. *Id.* "[I]f there is substantial evidence on the record as a whole, [the Court] must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992). In reviewing whether the ALJ's decision was supported by substantial evidence, this Court does not substitute its own judgment for that of the ALJ—even if different conclusions could be drawn from the evidence, and even if this Court may have reached a different outcome. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

## IV.    Discussion

Plaintiff argues her case should be remanded because: (1) the ALJ improperly evaluated her somatoform disorder; (2) the ALJ improperly decided her RFC based on the ALJ's own interpretation of her medical condition, rather than relying on medical opinions; and (3) the ALJ's RFC decision did not account for her severe headaches.

First, plaintiff claims the ALJ's conclusions were not supported by substantial evidence because the ALJ improperly evaluated her somatoform disorder. Somatoform disorder is a conversion disorder. The Eighth Circuit has discussed the proper evaluation of cases involving somatoform disorder in detail:

> Conversion disorder is a phenomenon in which a person actually and subjectively experiences symptoms without a known underlying medical cause. It is believed the symptoms . . . result from an unconscious,

17

involuntary conversion of mental stress into a physiological symptom. In prior opinions, we reviewed these or similar disorders and noted the difficulty of assessing how such disorders limit a person's activities. In particular, we noted that a prime feature of conversion disorder may be a disconnect between the actual severity of symptoms demonstrated by clinical evidence and the way the applicant subjectively perceives the symptoms. That is not to say this exaggerated experience of symptoms amounts to malingering. Rather, the applicant actually believes herself to be experiencing symptoms at a greater level of severity than clinical evidence can support.

Given this disconnect, an obvious difficulty arises when it becomes necessary to make credibility assessments in cases involving somatoform phenomena. Subjective perceptions of somatoform effects may, in fact, be debilitating even when clinical or diagnostic medical evidence does not fully support the claimed symptoms. It nevertheless remains necessary to make credibility assessments in these settings, and in cases involving somatoform disorder . . . an ALJ is not free to reject subjective experiences without an express finding that the claimant's testimony is not credible. Where such a finding has been made, we will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints . . . even in cases involving somatoform disorder.

Given the difficulty in this area, if an ALJ expressly accepts that a claimant suffers from a somatoform disorder, but also finds the claimant at least partially non-credible, the ALJ ideally should set forth the credibility determination with sufficient detail to expressly inform the reviewing court as to the factual details of the petitioner's limitations as accepted or believed by the ALJ. And in this type of case, even more so than in other cases, corroborating testimony from actual witnesses such as family members or former employers regarding the nature of the symptoms may hold particular value for a fact finder.

*Nowling v. Colvin*, 813 F.3d 1110, 1113-15 (8th Cir. 2016) (cleaned up).

Plaintiff argues the ALJ's decision was not supported by substantial evidence because the ALJ discredited her subjective complaints of pain without properly considering

18

the impact of her somatoform disorder and without evaluating other factors besides lack of consistency between the objective medical evidence and her subjective complaints.  *See Hamman v. Berryhill*, 680 Fed. Appx. 493, 495 (8th Cir. 2017) (per curiam) (unpublished) ("[Plaintiff] is correct that an ALJ may not find that a claimant with somatoform disorder lacks credibility solely because the claimant's self reporting of symptoms is not supported by objective medical data . . . .").

Plaintiff points out the Eighth Circuit's instruction that "[i]n cases involving somatoform disorder, an ALJ may not dismiss a claimant's subjective experiences without an express finding on the record that his testimony is not credible." *Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997).  Defendant argues an express credibility finding is no longer required because the applicable policy was updated in 2016 and eliminated the word "credibility."  *See* Social Security Ruling 16-3p (2016).  Even though there may no longer be an express credibility finding required, the Eighth Circuit has explained this change is primarily in terminology, not substantive analysis.   Instead, the change is meant to clarify "that the Commissioner's review of subjective assertions of the severity of symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between subjective assertions and the balance of the record as a whole."  *See Noerper v. Saul*, 964 F.3d 738, 745 n.3 (8th Cir. 2020).

Here, the ALJ considered the "the level of consistency between subjective assertions and the balance of the record as a whole" in determining plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the evidence in the record.  *See Noerper*, 964 F.3d at 745 n.3.  But that determination is not

supported by substantial evidence because the ALJ expressly accepted that plaintiff suffers from somatoform disorder but did not "adequately consider the effects" of that disorder. *See Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989). And, in evaluating the consistency of plaintiff's statements against the evidence in the record, the ALJ also relied on findings that are not supported by the record.

The ALJ's inconsistency finding depends primarily on perceived inconsistencies between the severity of plaintiff's subjective complaints of pain and the objective medical evidence. The ALJ emphasized that plaintiff had "normal examinations" and showed normal strength in extremities, range-of-motion, etc. On this basis, the ALJ discredited medical opinions that indicate plaintiff cannot work, including an assessment from her treating provider. "[A]n ALJ may not find that a claimant with somatoform disorder lacks credibility solely because the claimant's self reporting of symptoms is not supported by objective medical data; that disparity itself is symptomatic of somatoform disorder, which 'causes individuals to exaggerate their physical problems in their minds beyond what the medical data indicates.'" *Hamman*, 680 Fed. Appx. at 495 (cleaned up) (quoting *Easter*, 867 F.2d at 1130). In addition to objective medical data, other factors to consider include "the claimant's work history, and other evidence relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019); *see also* 20 C.F.R. §§404.1529(c)(3), 416.929(c)(3).

20

The ALJ did consider several other factors: (1) plaintiff's medication history, namely, the ALJ's finding that at one visit in June 2018, a doctor only advised plaintiff to take ibuprofen to treat her back pain; (2) the ALJ's disbelief of plaintiff's described limitations in her daily life; (3) Dr. Lysne's finding that plaintiff appeared to exaggerate her cognitive deficiencies at her mental consultative exam, and the perceived contrast between plaintiff's ability to recall information or understand instructions at that appointment and prior records indicating plaintiff had good recall and non-impaired thought content; and (4) the ALJ's finding of an inconsistency between plaintiff's displayed language barrier at her consultative examinations and one record in which a social worker said plaintiff could communicate confidently in English.  But, as explained below, there are issues with the ALJ's findings on each of these factors.

First, although a conservative treatment history can support an adverse credibility finding regarding pain complaints, the ALJ's finding that a doctor only advised plaintiff to take ibuprofen for her back pain in June 2018 is not supported by the record.  Plaintiff's records from her June 2018 appointment state she was taking cyclobenzaprine for her back and shoulder pain but it was not helping, so the doctor recommended she "continue a short course of cyclobenzaprine but can increased [sic] to TID [three times a day] as needed. **Also** can use ibuprofen for pain as Naproxen may increase her blood pressure."  *See* Doc. #12-11 at 523-24 (emphasis added).  Relying on this error also ignores the context of the whole record, which shows plaintiff took prescription medication for pain for an extended period but frequently complained that prescribed and over-the-counter medications were not controlling her pain; that she sometimes received more significant treatments through

21

a pain clinic or ER; and that her treating doctors changed and increased her medications over time and opined that she should participate in a chronic pain study.  The ALJ also noted plaintiff went to the doctor once with a severe headache and did not report back or neck pain at that visit but did not place that in the context of plaintiff's history of regularly reporting ongoing and worsening back and neck pain.

Second, the ALJ indicated she did not believe plaintiff's described limitations in daily activities because, at her orthopedic examination in 2018, plaintiff could get out of a chair and onto an examining table; showed 5/5 strength in her lower extremities; and had good range of motion in her hips and ankles.  The analysis does not mention the limitations and pain plaintiff demonstrated in that same examination.  It appears to discredit plaintiff's described limitations in her daily activities solely based on a perceived lack of objective medical evidence supporting them at one examination in 2018, which is not consistent with the analysis the Eighth Circuit applies.  *See Hamman*, 680 Fed. Appx. at 495; *Nowling*, 813 F.3d at 1115; *Simmers v. Saul*, 478 F.Supp.3d 747, 759-60 (S.D. Iowa 2020).

Third, Dr. Lysne's finding that plaintiff appeared to exaggerate her cognitive abilities gives some support to an adverse credibility finding.  But the ALJ's analysis on this point is not supported by the record and incorrectly characterizes somatoform disorder. The ALJ wrote: "In 2018, the consultative examiner assessed the claimant as having somatic symptom disorder (6F/5).  This was because the examiner found that the claimant appeared to exaggerate her inability to understand instructions, as well as her difficulty in responding to questions (6F/5)."  Doc. #12-3 at 17.  The record does not indicate Dr. Lysne diagnosed plaintiff with somatoform disorder because of his perception that she

22

exaggerated cognitive deficiencies. Somatoform disorder is not characterized by intentional exaggeration of impairments; it is a "mental disorder that causes a distorted perception of . . . physical ailments," a disorder that causes plaintiff to experience "her physical problems as worse than they may in fact be" in a way she cannot control. *Easter*, 867 F.2d at 1129, 1131. Dr. Lysne did not suggest plaintiff was exaggerating her pain symptoms. Instead, despite some concerns that plaintiff exaggerated her cognitive deficiencies, Dr. Lysne diagnosed plaintiff with somatoform disorder, based on her preoccupation with her pain and the anxiety it caused her and her high reports of pain. *See* Doc. #12-10 at 380-81. The Court finds no indication in the record or in the ALJ's decision that any medical provider thought plaintiff exaggerated her reports of pain. *See Easter*, 867 F.2d at 1130.

Fourth, the ALJ found an inconsistency between plaintiff's displayed language barrier at her consultative examinations and the one record in which a social worker plaintiff had seen a couple weeks prior commented that plaintiff felt confident communicating in English with him without an interpreter. This could be perceived as an inconsistency, but given the other issues, it does not show good cause to discredit plaintiff's subjective complaints of pain, considering the whole record. *Cf. Noerper*, 964 F.3d at 745 n.3; *Nowling*, 813 F.3d at 1121. Plaintiff's records include many indications that she primarily spoke Bosnian and spoke only limited English. She relied on an interpreter at appointments with her primary care providers and was sometimes accompanied by her daughter. She testified at the hearing through an interpreter; she said she did speak some English, but only a limited amount. That a social worker plaintiff had seen a couple weeks

23

prior—who, at that point, said she spoke Bosnian and came with her daughter—said plaintiff could communicate with him in English does little to show plaintiff was being dishonest in relying on interpreters at consultative examinations where she was asked to describe her medical history and complete exercises like counting by serial 7's and describing the association between different words.

The ALJ's opinion cites plaintiff's somatoform disorder but "does not adequately consider the effects of that mental condition." *Easter*,  867 F.2d at 1130.  "The ALJ . . . did not address the primary feature of conversion disorder and somatoform symptoms, namely, the extent to which [plaintiff] actually perceived symptoms and the extent to which conversion disorder rather than a lack of credibility might explain an absence of objective medical support for her symptoms." *Nowling*, 813 F.3d at 1118.  Even so, this Court could affirm if the "remainder of the record . . . supports the ALJ's credibility determination." *Hamman*, 680 Fed. Appx. at 495 (cleaned up).  But after careful review of the whole record, and given the issues described above, the Court is unable to find such support.  As a result, the Court will remand with instructions to evaluate plaintiff's case in accordance with the Eighth Circuit's directives on evaluations involving somatoform disorder.

Plaintiff also claims the ALJ improperly decided her RFC based on the ALJ's own interpretation of her medical condition, rather than properly relying on medical opinions, and failed to properly account for her headaches.  Although an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the

responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016) (cleaned up).  Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  The Court will not reverse on this basis.

### V.    Conclusion

The ALJ's decision is not supported by substantial evidence.  On remand, the ALJ should consider plaintiff's claim in accordance with the Eighth Circuit's guidance on evaluating somatoform disorder cases, including any further development of the record required to conduct such evaluation.  *See Noerper*, 964 F.3d at 747.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **REVERSED** and **REMANDED**, in accordance with the instructions in this memorandum and order.  A separate judgment will accompany this order.

Dated this 29th day of September, 2021.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE